570 A.2d 874

**Roger BROSEUS**

v.

**Isadel L. BROSEUS.**

**No. 999, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

March 6, 1990.

Steven R. Buckner (Caplan, Wechsler, Selzer & Buckner, on the brief), Bethesda, for appellant.

Jennifer Evans, Rockville, for appellee.

Argued before ALPERT, ROSALYN B. BELL and WENNER, JJ.

ROSALYN B. BELL, Judge.

This over-priced tragedy from the Circuit Court for Montgomery County raises seven issues, one of which has two parts. We conclude that all of the issues are devoid of merit and affirm.

Roger and Isadel Broseus were married on May 2, 1970. They are the parents of one child, Alexandra, who was born on August 22, 1981. Until the parties separated on July 30, 1985, the family lived together in a three-bedroom home which they owned in Gaithersburg. The home was fully furnished and contained many items acquired during the marriage. From April, 1986, when he obtained *pendente lite* relief, to the present day, the family home has been occupied by Dr. Broseus.

Roger Broseus, Ph.D., was aged 46 and in good health at the time of trial on May 15 and 16, 1989. He was a commissioned officer in the Public Health Service, assigned to the National Institutes of Health. Dr. Broseus had been employed by the Public Health Service since January, 1970. His salary at the time of the trial was $56,411.52 per year, $11,627.52 of which was nontaxable as housing and subsistence allowances. He ordinarily received annual cost of living increases, benefits, and direct medical and dental care coverage for himself and his family.

Isadel Broseus was aged 43 at the time of trial. She was educated in the Philippines where she had obtained a bachelor's degree in medical sciences in 1965. Prior to the parties' separation, she had not been employed since 1977. Following the separation, she obtained a part-time job; she initially earned $4.75 per hour, then $6.00 per hour. Since August of 1988, she has been a liaison between a laboratory and physicians at Providence Laboratory Associates with an annual salary of $19,674. She has only minimal benefits associated with her employment. Although in good physical health at the time of the trial, Ms. Broseus was under regular psychiatric care which the court had ordered her to continue in the interests of the minor child. With the divorce, her insurance coverage under Dr. Broseus' plan would terminate.

This litigation began after Dr. Broseus took the minor child and left Ms. Broseus on July 30, 1985. Dr. Broseus obtained legal custody of Alexandra by court order on October 15, 1985. In March of 1986, he obtained *pendente*

*lite* custody and use and possession of the family home; and Ms. Broseus was required to relinquish her use and possession of the family home. At the time of the trial, she lived in a sparsely furnished efficiency apartment with a monthly rent of $485. She used public transportation and cabs because her car was repossessed when the payments were not made. Following a hearing before the Master for Domestic Relations in December, 1986, the Master found that Dr. Broseus had deserted Ms. Broseus and recommended that she be divorced on the grounds of desertion. She obtained that divorce in May of 1989.

At that December, 1986 hearing, the Master recommended that Ms. Broseus be awarded custody and other relief, including, but not limited to alimony and child support.[1] Dr. Broseus took exceptions and hearings were held in November of 1988 on the custody, visitation and ongoing use and possession of the family home. Further hearings were held in May of 1989 on the financial and property issues.

After the November, 1988 hearings, Dr. Broseus was granted custody of the minor child. Ms. Broseus, however, was awarded liberal visitation amounting to approximately 48 percent of Alexandra's time. Ms. Broseus provided support beyond mere food and shelter to Alexandra during the periods of her physical custody. On May 15 and 16, 1989, a further hearing was held before the Chancellor on Dr. Broseus' Exceptions to the Master's Report and Recommendations on all financial issues pending in the case. At the conclusion of the hearing on May 16, 1989, the Chancellor made a number of rulings. The Chancellor entered Judgment of Absolute Divorce on May 25, 1989 consistent with these rulings. From this judgment, Dr. Broseus has appealed, contending the Chancellor erred:

---

1. The merits hearing before the Master was in December, 1986. He did not issue a report until June of 1988. Exceptions were noted and filed and hearings were held before the Chancellor in November of 1988 on the custody, use and possession of family property and visitation issues only.

I. by denying Dr. Broseus contribution for all payments made by him relating to the mortgage on the marital home since the date of separation;

II. by abusing his discretion in awarding indefinite alimony to Mrs. Broseus;

III. in increasing the amount and duration of alimony to be paid by him since Ms. Broseus did not except to the Master's Report and Recommendations;

IV. in abusing his discretion in awarding $5,000 in attorney's fees to Ms. Broseus and denying the claim for attorney's fees made by Dr. Broseus;

V. in ordering Dr. Broseus to pay Ms. Broseus $2,000 representing the entire proceeds of the sale of the automobile owned jointly by the parties;

VI. (a) in overruling Dr. Broseus' Exception to the Report and Recommendations of the Master on the value of the pension when the time between the evidentiary hearing before the Master and the Chancellor's award was approximately 30 months;

VI. (b) in overruling Dr. Broseus' Exception to the Report and Recommendations of the Master as to the pension but, nevertheless, modified the Master's recommendation by increasing Ms. Broseus' rights in that pension;

VII. in failing to award any child support to Dr. Broseus.

Ms. Broseus, although she filed no cross-appeal, seeks sanctions under Rule 1–341 for the filing of the appeal.

## CONTRIBUTION

Appellant made the mortgage payments on the family home from July, 1985 through the time of trial in May, 1989. Appellee contributed no funds to those payments, but did not live there after April, 1986. Appellant seeks contribution for his payments on account of the mortgage. He asserts that, "[a]bsent a finding of ouster or the existence of an agreement between the parties, the Chancellor was required to make an award of contribution to the Appellant." He cites no authority for this statement. To

the extent he suggests "the Chancellor was required" to make such an award, we hold the assertion is misleading and a misstatement of the law.[2]

In *Spessard v. Spessard,* 64 Md.App. 83, 95–96, 494 A.2d 701 (1985), in discussing contribution where one party left the home ostensibly after being battered, we said:

"We point out, as we have before, that the chancellor is not required to place the parties in a position of monetary equality.... The chancellor is not precluded from allowing reimbursement to a spouse for maintaining tenancy by the entireties property nor must he require that the spouse out of possession contribute a proportionate share of the payments. Depending on the circumstances, requiring contribution could create the very inequity which the Act was designed to prevent. Hence, the test involves whether the total disposition is equitable." (Citation omitted.) (Footnote omitted.)

■ Between tenants by the entirety, the entitlement to contribution is an equitable matter and not a matter of right and is within the sound discretion of the trial court. *Wassif v. Wassif,* 77 Md.App. 750, 766, 551 A.2d 935, *cert. denied,* 315 Md. 692, 556 A.2d 674 (1989); *Spessard,* 64 Md.App. at 90, 494 A.2d 701. We find no abuse of that discretion in this case.

■ Clearly the nature of the Marital Property Act was remedial and the Act should be liberally construed. *Harper v. Harper,* 294 Md. 54, 64, 448 A.2d 916 (1982). Contribution is a factor that may be considered in making a

---

**2.** The Chancellor ruled that that granting of a use and possession order was a "de jure ouster." We need not and do not comment on this ruling as it was neither briefed nor argued by counsel. We question, but leave for another day, this issue: Does the common law concept of ouster apply in a domestic dispute as it does at common law? The Legislature has said in Md.Fam.Law Code Ann. § 8–211 (1984), that a use and possession order is not evidence of constructive desertion. It does not say whether that order constitutes an ouster. When one party leaves the home because the marriage has become unbearable or the other party seeks and is granted a use and possession order, is that an ouster that excuses contribution?

monetary award in accordance with Property Disposition in Annulment and Divorce, Md.Fam. Law Code Ann. §§ 8–201 *et seq.* (1984 & 1989 Cum.Supp.).[3] While the Chancellor may consider the issue of contribution, the Chancellor may or may not consider contribution in making a monetary award. In the instant case, the Chancellor found that it was unreasonable for appellant to expect reimbursement for his payments on their joint obligation as he was receiving the benefit of the use of the residence and since appellee's standard of living was considerably lower than his. We concur. Appellant makes no claim that the expenses of the house exceeded the value of use of the premises, and the record indicates no basis on which to make such an argument. Several reasons appear that would support the Chancellor's decision to reject any award of contribution: (1) the payments from July 1985 through March 1986 constituted support to appellee; (2) the payments from April 1986 to the divorce were less than the fair rental value of the premises; (3) appellant took the deductions for the real estate tax and interest portions of those payments on his separately filed income tax returns during that time period; and (4) the payments were made under circumstances that made it unreasonable for appellant to expect appellee to make contribution, *i.e.*, her depressed living situation as compared to his.

Further, since the parties were married during the time appellant made those payments, they were made from marital funds and contribution was not mandated. *Prahinski v. Prahinski*, 75 Md.App. 113, 141, 540 A.2d 833, *cert. granted* 313 Md. 572, 546 A.2d 490 (1988). If the payments had been made out of or directly traceable to nonmarital funds, the issue would be viewed from a different posture. That was not the case. These payments were admittedly

---

**3.** All sections referred to hereinafter are from the Family Law Article unless otherwise noted.

made from marital funds.[4]

■ The Chancellor granted a three-year use and possession award to appellant, and ordered him to bear the cost of the mortgage, any indebtedness related to the property, the cost of maintenance, insurance, assessments and taxes. He further ruled that, upon expiration of the use and possession order, the property be evenly divided with no contribution or offset. He ordered the payments be made by appellant in accordance with § 8–208(c), which permits the allocation of financial obligations, and the ultimate partition and division of the proceeds under § 8–202. The right to direct who shall bear the burden of the costs of the property and the right to determine alimony, child support and a monetary award of necessity includes the right to establish whether any right to contribution will flow from the fulfilling of that obligation to pay the costs. For the reasons already stated, we see no error of law or abuse of discretion by the Chancellor in the instant case.

## INDEFINITE ALIMONY

Appellant contends that the Chancellor abused his discretion in awarding indefinite alimony to appellee. In determining whether to award alimony, the chancellor must be guided by § 11–106.[5] Appellant contends that, "despite a

4. In *Crawford v. Crawford,* 293 Md. 307, 443 A.2d 599 (1982), the Court held that the presumption of gift doctrine is not applicable to payments made during the period from the separation until the divorce and that contribution was not necessarily prohibited. We note that in *Crawford,* neither the Marital Property Act nor the question of whether the funds were marital property was raised in the trial court, nor were the issues raised on appeal. In fact, in *Crawford,* no brief was even filed by the co-tenant sought to be charged with contribution.

5. Section 11–106 provides:
"(a) ... (1) The court shall determine the amount of and the period for an award of alimony.
"(2) The court may award alimony for a period beginning from the filing of the pleading that requests alimony.

plethora of evidence to the contrary," the Chancellor abused his discretion in awarding indefinite alimony to appellee.

 Fortunately, the Chancellor in this case was most meticulous in considering each factor. From our perspective, this case may be a model for how chancellors should articulate these findings. The Chancellor found, among other things, that Dr. Broseus can be wholly self-support-

---

"(3) At the conclusion of the period of the award of alimony, no further alimony shall accrue.

"(b) ... In making the determination, the court shall consider all the factors necessary for a fair and equitable award, including:

(1) the ability of the party seeking alimony to be wholly or partly self-supporting;

(2) the time necessary for the party seeking alimony to gain sufficient education or training to enable the party to find suitable employment;

(3) the standard of living that the parties established during their marriage;

(4) the duration of the marriage;

(5) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(6) the circumstances that contributed to the estrangement of the parties;

(7) the age of each party;

(8) the physical and mental condition of each party;

(9) the ability of the party from whom alimony is sought to meet that party's needs while meeting the needs of the party seeking alimony;

(10) any agreement between the parties; and

(11) the financial needs and resources of each party, including:

(i) all income and assets, including property that does not produce income;

(ii) any award made under §§ 8–205 and 8–208 of this article;

(iii) the nature and amount of the financial obligations of each party; and

(iv) the right of each party to receive retirement benefits.

"(c) ... The court may award alimony for an indefinite period, if the court finds that:

(1) due to age, illness, infirmity, or disability, the party seeking alimony cannot reasonably be expected to make substantial progress toward becoming self-supporting; or

(2) even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate."

ing, while Ms. Broseus cannot. He also found that Ms. Broseus could not be expected to obtain a better paying job without detracting from her ability to care for Alexandra. He made specific findings of fact that were supported by the record. He compared the respective standards of living of the parties in graphic detail:

"I am convinced that without doubt that there is at least one television set in Dr. Broseus' home and that it probably has color and that it cannot be equated with a nine or 11 inch TV that brings in two television channels, or with a kitchen where if you seat two—if you have two chairs, there is not room to walk, and with second-hand furniture or worse. That is a poverty-level standard, and she is entitled to better."

After this thorough consideration, the Chancellor awarded the sum of $600 per month in indefinite alimony under the provisions of § 11–106(c)(2), specifically finding

"that even after Ms. Broseus will have made as much progress towards becoming self supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate. ... The disparity of 54 percent is likely to grow larger not smaller as Dr. Broseus advances at a greater rate, in my judgment, than Ms. Broseus is likely to advance, so that the disparity is likely to become even greater. Hence, permanent [sic] alimony is not only permitted, in my view, it is absolutely required here. I so find."

In assessing the weight to be given to the different income levels of the parties, the chancellor must determine whether that disparity will change and if so to what extent. In this instance, appellee was earning 34.9 percent of appellant's income [6] and the Chancellor found that percentage would likely decrease. In *Kennedy v. Kennedy*, 55 Md.App. 299,

---

6. The Chancellor referred to $58,199 as the base rather than $56,411; perhaps he was assigning an increased value to the nontaxable items and fringe benefits. If so, the percentage would be 33.8 percent of his income.

307, 462 A.2d 1208 (1983), Ms. Kennedy was earning approximately 33 percent of her husband's income. In *Bricker v. Bricker*, 78 Md.App. 570, 577, 554 A.2d 444 (1989), Ms. Bricker was earning 35 percent of her husband's income. In both *Kennedy* and *Bricker*, we held there was no abuse of discretion by the chancellor in awarding indefinite alimony. Similarly, we find none here. To the extent we are considering the facts, our review is limited to reviewing the evidence to assure ourselves that the Chancellor's decision was not clearly erroneous. Rule 8–131(c). We have no difficulty in determining the evidence here amply supported the Chancellor's findings and conclusions.

## THE CHANCELLOR'S ROLE WHEN PRESENTED WITH EXCEPTIONS

█ Appellant contends that, since appellee did not take exception to the Master's Recommendation regarding time limited rehabilitative alimony in the amount of $500 per month, it was error for the Chancellor to extend the duration and increase the amount.[7] We disagree.

In December of 1986, appellant took exceptions to the Master's Report and Recommendations and in accordance with Rule 2–541(i) a hearing was held. The hearing on the exceptions regarding financial issues, however, did not occur until May, 1989, nearly two and one-half years after the hearing before the Master had occurred. The Chancellor acknowledged the unfortunate time lag; he categorized the hearing on the exceptions therefore as a "hybrid" one where he would consider the evidence before the Master, plus the additional evidence presented to supplement the record.

The respective roles of the master and the chancellor have been discussed by this Court on numerous occasions.

---

**7.** Appellant states that appellee made no request at trial for alimony greater in amount or longer in duration than the award recommended by the Master. This is misleading. Appellee in her trial memorandum referred to $500 as the *minimum* amount and specifically sought indefinite alimony.

*See Levitt v. Levitt,* 79 Md.App. 394, 398–99, 556 A.2d 1162, *cert. denied,* 316 Md. 549, 560 A.2d 1118 (1989); *Brandon v. Brandon,* 66 Md.App. 214, 221–22, 503 A.2d 264 (1986); *Mitchell v. Mitchell,* 61 Md.App. 535, 541–42, 487 A.2d 680 (1985); *Dobrow v. Dobrow,* 50 Md.App. 465, 468–69, 439 A.2d 596 (1982); *Wenger v. Wenger,* 42 Md.App. 596, 602, 402 A.2d 94, *cert. granted,* 286 Md. 755 (1979), *appeal dismissed per stipulation,* January 1, 1980; *Ellis v. Ellis,* 19 Md.App. 361, 365–67, 311 A.2d 428 (1973). In discussing these two roles, we have said:

> "A chancellor may defer to the master on such first-level facts as that a husband makes $50,000 a year; the yearly orthodontia bill is $1,500; the rent is $300 a month; the bank account of thus and so is thus and so. On the other hand, such second-level, conclusory 'facts' as the wife's ultimate need or the husband's ultimate ability to pay are dispositional in nature and are the ultimate province of the chancellor."

*Wenger,* 42 Md.App. at 607, 402 A.2d 94.

> "The Master's primary responsibility is to develop the first-level facts.... After establishing the factual record, the Master may then draw conclusions from the first-level facts and use these conclusions to make recommendations, which the Chancellor is free to disregard. It is the Chancellor's responsibility, not the Master's, to determine finally the parties' rights. Simply put, the Master is a ministerial and not a judicial officer."

*Levitt,* 79 Md.App. at 399, 556 A.2d 1162 (citation omitted).

The chancellor undertakes his or her role when an exception is filed. The chancellor may alter or approve the master's recommendation by increasing the term, decreasing the term or approving the term recommended. "Litigants ... in all judicial proceedings are entitled to have their cause determined ultimately by a duly qualified judge of a court of competent jurisdiction." *Ellis,* 19 Md. at 365, 311 A.2d 428 (citations omitted). Appellant sought the review by the Chancellor and will not be heard to complain

because the Chancellor did what the law requires the Chancellor to do.

## ATTORNEY'S FEES

Section 12–103 states in pertinent part:

"(a) **In general.**—The court may award to either party the costs and counsel fees that are just and proper under all the circumstances in any case in which a person:

(1) applies for a decree or modification of a decree concerning the custody, support, or visitation of a child of the parties...."

"(b) **Required considerations.**—Before a court may award costs and counsel fees under this section, the court shall consider:

(1) the financial status of each party;

(2) the needs of each party; and

(3) whether there was substantial justification for bringing or defending the proceeding."

Section 11–110 defines "proceeding" as including a proceeding for alimony and alimony *pendente lite.* "Reasonable and necessary expense" includes suit money, counsel fees, and costs. Under § 11–110(b), the court may

"order either party to pay to the other party an amount for the reasonable and necessary expense of prosecuting or defending the proceeding."

But,

"[b]efore ordering the payment, the court shall consider:

(1) the financial resources and financial needs of both parties; and

(2) whether there was substantial justification for prosecuting or defending the proceeding."

§ 11–110(c).

The court's exercise of its discretion when awarding attorney's fees must be based upon the statutory criteria *and the facts of the case. Jackson v. Jackson,* 272 Md. 107, 112, 321 A.2d 162 (1974) (emphasis added). In the

instant case, the Chancellor ordered appellant to pay $5,000 as attorney's fees to appellee.

Both appellant and appellee have incurred huge attorney's fees. Appellant incurred attorney's fees in the amount of $71,823 before the trial; $44,137.03 remained due and owing as of the trial date. Appellee incurred $48,-905.17 worth of attorney's fees, of which $37,590.17 remained due and owing before trial. These sums apparently did not include the fees for the trial itself.[8]

 The Chancellor noted the language of both § 11–110 and § 12–103 and underscored the court's ability to make an award to "either party ... under all the circumstances." Just because appellant prevailed on the custody issue does not preclude an award to appellee, so long as there was substantial justification for bringing or defending the proceeding under § 11–110 or § 12–103.

 The amount of the attorney's fees award is within the discretion of the chancellor. Although that discretion is subject to review by this Court, we will not disturb the award unless that discretion was exercised arbitrarily or the judgment was clearly wrong. *Danziger v. Danziger*, 208 Md. 469, 475, 118 A.2d 653 (1955); *Sody v. Sody*, 32 Md.App. 644, 660, 363 A.2d 568 (1976). The chancellor may make a fee award based upon the record and observations at trial. *Sharp v. Sharp*, 58 Md.App. 386, 406, 473 A.2d 499 (1984).

 Appellant contends that his financial condition is inferior to that of appellee and hence, he should be awarded fees from her. Appellant had been able to pay a total of $27,685.97 toward his total fees of $71,685.97. At the time of trial, he had been paying $400 per month to his attorney since some time in 1986. Appellee had total fees of $48,-905.17 through May 14, 1989 of which she had been able to

---

**8.** Appellant was represented by the same counsel throughout. Appellee was represented by other counsel until just before trial. Her fee for current counsel prior to trial was $5,710.45.

pay only $11,315. She had borrowed virtually all of that money from family and friends. He, on the other hand, had used marital funds to pay his fees of over $27,000. So, in effect, she had contributed what had been her interest in the joint account toward those fees.[9] The Chancellor accurately found that appellant was far more likely than appellee to be able to pull himself out of debt.

The Chancellor indicated that he had reviewed the evidence relating to attorney's fees, including the record of the Master's proceedings, the Master's rationale for the recommendation concerning attorney's fees, and the financial status and needs of each of the parties. The Chancellor found that appellee's attorney's fees were fair, reasonable and necessary. Moreover, given her limited income and her extensive needs it was appropriate to require appellant to make a comparatively small contribution. We cannot say that the Chancellor abused his discretion in making too large an award to appellee. What constitutes a reasonable amount of attorney's fees to be awarded rests within the sound discretion of the court. *Holston v. Holston*, 58 Md.App. 308, 326, 473 A.2d 459 (1984).

Because the fees involved here appear excessive, we are compelled to comment further. Both parties were poorly served by the legal system and impoverished by the amount of the fees. Appellant filed suit on July 31, 1985. Alexandra was then three years old. It was not until March, 1986 that *pendente lite* relief was granted providing alimony *pendente lite* to appellee. During much of that period, appellee lived on borrowed funds. In August of 1986, the parties agreed to refer the case to the Master of Domestic Relations for a trial on the merits. This trial occurred on December 2, 3, and 4 of 1986. The Master did not file

---

**9.** Although no finding was made, allegations were made that appellant closed all accounts including a joint savings account, when he left. The amount appellant took is unclear. But his payment of fees out of any joint or marital funds results in a contribution by her of possibly one half the fees he paid ($13,843), while he contributed only the $5,000 awarded toward hers. He had no cause to complain. She did.

recommendations until January 28, 1988. A Motion of Intent to Except was noted February 1, and ultimately on June 21, 1988, the Master issued his report. Exceptions were filed on July 11, 1988, a hearing was held on custody, use and possession and visitation on November 28, 29, and 30. Custody was determined at the conclusion of the hearing. A further hearing was held May 15 and 16, 1989 [10] and a decision again made from the bench; by then Alexandra was seven. Alexandra's parents had been in litigation almost half of her life and had spent tens of thousands of dollars which could have funded her college education and maybe even her doctorate.

Moreover, we are concerned about a comment by the Chancellor that appellant's then attorney and appellee's prior attorney had both taken second trust notes on the parties' home. The Chancellor commented:

"[i]t is noted that the attorneys who have principally represented these parties, one of whom is here, have the greatest interest in the equity in the property by virtue of the deed of trusts that each has taken."

We have no details about those deeds of trust and make no untoward inference in this case. Moreover, we recognize that attorneys are entitled to be paid. We suggest, however, that this type of transaction is fraught with the potential of overreaching and conflict of interest.

## TWO THOUSAND DOLLARS

The Chancellor ordered appellant to pay appellee the sum of $2,000. This amount equalled the proceeds of the sale of an MG automobile owned jointly by the parties. Appellee claims the history of the dispute surrounding the automobile goes beyond the record of this appeal. We agree. We note that in the February, 1989

---

**10.** No criticism is aimed toward or deserved by the Chancellor for the delays. While a further delay occurred between November, 1988 and May, 1989, a hearing had been set in February but was postponed, according to the record, because appellant was hospitalized.

order, the court ordered appellant to provide reasonable means for appellee to obtain a car.[11] We assume the testimony related to the car and what occurred. Why the Chancellor ordered appellant to provide appellee with a car is essential to our evaluation on this issue of whether there was an appropriate monetary award. We assume the November hearing addressed whether appellant dissipated the $2,000 and whether, under all the facts, all the marital property not subject to a use and possession order should have been awarded to appellee. But we have no record extract or transcript of that hearing. Appellant is required to furnish us with all material reasonably necessary to decide each issue. We conclude such evidence was presented at that time and is reasonably necessary to decide the issue. Hence, we decline to reach this issue. Rule 8–501. Were we to have reached the issue, we would have inferred from what we do know that, during the pendency of the proceedings: (1) a family car which was subject to a *pendente lite* use and possession order in favor of appellee was repossessed; (2) that appellant had purchased a $7,000 car for himself but failed to make the payments on the car being driven by appellee and otherwise provide adequate support for appellee; (3) that appellee used public transportation; and (4) that appellant applied the proceeds from the sale of the jointly owned MG to his personal VISA debt. If our inferences were supported by the absent record, we would have had no difficulty finding the Chancellor was well within his discretion in making a monetary award of the full $2,000.

## THE PENSION
### —The Value—

The Master found the value of appellant's pension was $223,619. The Master recommended that appellee receive her portion of that pension in accordance with the formula

---

11. The record indicates neither whether this order has been complied with nor the basis for the order.

upheld in *Bangs v. Bangs,* 59 Md.App. 350, 356, 367, 475 A.2d 1214 (1984):

$$\frac{1}{2} \times \frac{\text{years and months of marriage}}{\text{total years of employment}}$$

Appellant excepted to this portion of the Master's Report and Recommendation, believing it to be clearly erroneous

> "in that, the Master fails to find [to] what specific portion the Defendant is entitled, and fails to take into consideration that part of the pension that was earned by the Plaintiff prior to marriage, and which is not marital property."

Appellant now claims the Chancellor erred in overruling that exception in light of the time between the evidentiary hearing before the Master (December, 1986), the filing of the Master's Report (June, 1988) and the final award (May, 1989).

The appendix to appellant's brief contains exhibits filed by both parties indicating both argued that the pension was worth $223,619. We cannot determine whether this number was actually stipulated to in the Master's hearing. Nonetheless, the task of the Chancellor was to hear the exceptions.

 Appellant's complaint now is in two parts. First, he contends that the value as found by the Master had changed by the time of the May trial. Of course, the pension value must be found and assessed as of the date of the divorce. *Dobbyn v. Dobbyn,* 57 Md.App. 662, 675–76, 471 A.2d 1068 (1984). But in this case an amount was presented albeit as of an earlier date. No other evidence was offered; the Chancellor need not ignore an item where there is some evidence of value. Moreover, based on the method of computation followed by both actuaries, the value of appellant's pension would have been higher by the date of the hearing on the exceptions which hurt neither party.

*—The Formula—*

 Appellant complains that the Chancellor changed the Master's award on the pension and that he cannot do that; he can only overrule or sustain the exceptions. This indicates a total lack of understanding of the role of a chancellor and what occurred in this case. In the first place, the role of the chancellor as discussed earlier is to make decisions based on the facts which are supportable by the evidence as found by the master. Secondly, the Chancellor did not sway from the recommendation of the Master. The Master recommended using the *Bangs* formula and the Chancellor agreed. That numerator was changed to reflect the number of months the parties had then been married. This followed from the delay in the proceedings, which was not appellee's fault. The Chancellor could have used the number of months the parties were married as of the hearing before the Master, changed it to the number of months married at the time of divorce, used some number in between, or used some totally different division so long as he did not abuse his discretion. We perceive no abuse of that discretion.[12]

## CHILD SUPPORT

Appellant argues that the Chancellor erred in failing to award him child support. Both parties sought child support. Appellant contends that the Chancellor did not have authority to order him to pay child support to appellee since he was awarded legal custody of the minor child. Appellee argues that, because she had the child 48 percent of the time under the custody order, she had shared physical custody within the meaning of the child support guidelines, § 12–201(i) and that, pursuant to the guideline calculations, she should have received child support from appellant.

---

12. We agree that the time lag was totally inappropriate, but we find nothing in the record extract demonstrating any efforts by counsel to have the case acted upon more expeditiously. Again, we note appellee's trial counsel had only entered the case two months before the May trial.

Although the Chancellor correctly concluded he could award child support to either party, he did not. Had the Chancellor followed the guidelines, appellee would have received child support. The Chancellor painstakingly reviewed the required considerations in connection with the alimony award. The Chancellor clearly considered both parties' financial resources in coming to his decision on child support.

The Chancellor reviewed, among other things, appellee's direct expenditures on behalf of the minor child. Regarding whether to award child support and if so to whom, he said, "I am not awarding child support to either party. I have given consideration to the award of permanent [sic] alimony as I am required to, and I have given consideration to the use by [appellee] of a part of her funds for the benefit of her child."

The parents of a minor child are jointly and severally responsible for the child's support, care, nurture, welfare, and education. § 5–203(b)(1). This obligation varies in accordance with, among other things, the respective financial resources of the parties. *German v. German*, 37 Md.App. 120, 122, 376 A.2d 115 (1977). "The wide discretion of the chancellor to make an award of child support will not be set aside or modified unless clearly erroneous." *Wooddy v. Wooddy*, 258 Md. 224, 228, 265 A.2d 467 (1970); *Campolattaro v. Campolattaro*, 66 Md.App. 68, 83, 502 A.2d 1068 (1986). We cannot and will not say the Chancellor abused his discretion.

## THE TOTALITY OF THE DECISION

Appellant finally complains that if you put all these alleged errors together the award impoverishes him and, as such, it is unconscionable. The Chancellor made a minimal award to appellee of $5,000 on account of her attorney's fee and a monetary award of $2,000 which appellant admitted receiving for the sale of the car which was joint property. Appellant will have the home for three years, apparently at

substantially less cost to him than it is worth. We make this inference as appellant actually sought the use and possession order. If this inference is unwarranted, appellant can of course waive the provision and agree to sell the house now. Of his income of $56,411, he was ordered to pay appellee $7,200 per year, leaving him with $49,211.52, substantially more than her $19,674 salary augmented by alimony to $26,874. He was not ordered to pay any child support despite the fact that under the guidelines it appears that such an award would be appropriate. All in all, appellant was not maltreated by the Chancellor, as we see it. If appellant is impoverished, it is by the costs of this litigation over which he had considerable control, not by the Chancellor's rulings.

## RULE 1–341

Rule 1–341 provides:

"In any civil action, if the court finds that the conduct of any party in maintaining or defending any proceeding was in bad faith or without substantial justification the court may require the offending party or the attorney advising the conduct or both of them to pay the adverse party the costs of the proceeding and the reasonable expenses, including reasonable attorney's fees incurred by the adverse party in opposing it."

This Rule has been held to apply to all courts and to permit the sanction of reasonable attorney's fees and costs in appellate courts. *Blanton v. Equitable Bank, Nat'l Ass'n,* 61 Md.App. 158, 161, 485 A.2d 694 (1985).

 Appellee has sought such fees in this case for this appeal. We must say appellee has made a good case for such action, given the wide range of issues raised, the minimum of merit to any of them, the abuse of Rule 8–501 which resulted in two separate record extracts and what, at least on the surface, could be seen as over-lawyering, and the fact that appellee may have more to complain of in the decision than appellant. Rule 1–341 provides a harsh sanc-

tion, however, which should be limited to those situations without colorable merit.

> " '[F]ree access to the courts is an important and valuable aspect of an effective system of jurisprudence, and a party possessing a *colorable* claim must be allowed to assert it without fear of suffering a penalty more severe than that typically imposed on defeated parties.' "

*Dent v. Simmons,* 61 Md.App. 122, 124, 485 A.2d 270 (1985) (emphasis in original), quoting *Young v. Redman,* 55 Cal. App.3d 827, 838, 128 Cal.Rptr. 86, 93 (1976). *See also Needle v. White, Mindel, Clarke and Hill,* 81 Md.App. 463, 474, 568 A.2d 856, 861 (1990). We do not conclude that this appeal is not a colorable claim. Thus, we will not award appellee fees under Rule 1–341. We note appellant did raise the issues of child support and alimony on appeal, however, bringing into play §§ 12–103 and 11–110 which allow the court to award counsel fees without the "colorable claim" restrictions. Appellee may choose to pursue this route before the circuit court.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.

ALPERT, Justice, concurring.

I agree completely with the opinion of the majority except for a portion of the analysis of the "contribution" issue. There, the majority has stated in pertinent part:

> Further, since the parties were married during the time appellant made those payments, they were made from marital funds and contribution was not mandated. *Prahinski v. Prahinski,* 75 Md.App. 113, 141 [540 A.2d 833], *cert. granted,* 313 Md. 572 [546 A.2d 490] (1988). If the payments had been made out of or directly traceable to nonmarital funds, the issue would be viewed from a different posture. That was not the case. Those payments were admittedly made from marital funds.

(At 193–194.)

Notwithstanding that which we have said in *Spessard v. Spessard,* 64 Md. App. 83, 93, 494 A.2d 701 (1985), *Prahin-*

*ski v. Prahinski,* 75 Md.App. 113, 141, 540 A.2d 833, *cert. granted,* 313 Md. 572, 546 A.2d 490 (1988), and *Wassif v. Wassif,* 77 Md.App. 750, 766, 551 A.2d 935 (1989), I do not believe that the legislature intended the Marital Property Act of 1978, Fam.Law Art. §§ 8–201 to 8–213, to have any direct legal impact on the Maryland law of contribution between co-tenants. The Marital Property Act and the principles of contribution stand side-by-side, but quite separate and apart. From a functional standpoint, the differences may be of little practical effect.

Where payments are made by one spouse prior to divorce and are determined to be marital funds, the trial judge may offset that sum which is mandated by contribution principles by granting a monetary award in the amount of the contribution to the non-contributing party. Functionally, that is what happened in the instant case when the chancellor denied contribution to the appellant.

And the majority agrees, of course, that if the payments had been made out of or were directly traceable to non-marital funds, then contribution would be mandated. But even under those circumstances, the trial court, if it perceived other inequities, could offset the amount of contribution (wholly or partially) by a monetary award. In the long run, I believe that Maryland law will be better served by not mixing principles of contribution with principles arising out of the Marital Property Act.