864 A.2d 191

**Michael C. ALLISON**

v.

**Carol Ann ALLISON.**

**No. 207, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

Oct. 28, 2004.

Reconsideration Granted Jan. 7, 2005.

Barry J. Dalnekoff (Mark E. Mason, Erin Darner Gable, Dalnekoff & Mason, P.A., on the brief), Annapolis, for Appellant.

Ann C. Ogletree, Denton, for Appellee.

Panel: SALMON, DEBORAH S. EYLER and KRAUSER, JJ.

SALMON, Judge.

The appellant in this matter is Michael Allison ("Michael"), who was born on May 28, 1958. Appellee, Carol Ann Allison ("Carol Ann"), is twenty years older than Michael. After a marriage of approximately fifteen years, the two were divorced by the Circuit Court for Anne Arundel County. At the time of the divorce, Michael was forty-four and Carol Ann was sixty-four. The circuit court awarded Carol Ann $2,300 per month in indefinite alimony and a monetary award in the amount of $17,500.[1] Additionally, the court ordered that

> either Twenty-one Thousand Four Hundred Fifty Dollars and eighteen cents ($21,450.18) or the current balance of . . . [Michael's] 401(k) account, whichever is the lesser amount, shall be transferred from . . . [Michael's] 401(k) to a pension retirement, profit sharing or deferred compensation plan in . . . [Carol Ann's] name and this shall be accomplished through the entry of a qualified domestic relations order, which shall be submitted to the court by . . . [Carol Ann's] attorney after reviewed by . . . [Michael's] attorney.

Michael presents three questions in this appeal, viz:

I.   Did the trial judge err in finding that appellant dissipated assets when he used the money he borrowed from his 401(k) plan to make payments toward the parties' attorney fees?

II.  Did the trial judge err by including the amount of appellant's unpaid loan twice in calculating the value of his 401(k) plan and finding appellee's marital share of the 401(k) plan was $21,450.18?

III. Should the alimony award be reversed where neither the trial court's ruling nor the record indicate how the

---

1. The $17,500 was awarded to Carol Ann because she contributed $35,000 of non-marital funds toward the purchase of the marital home, which was titled in both names as tenants by the entireties.

trial judge exercised her discretion in determining the amount of the indefinite alimony award?

Carol Ann filed a cross-appeal, in which she raised two additional questions, which we have reordered:

IV. Does a reversal and remand on the issue of a monetary award automatically trigger a reversal on the issue of alimony?

V. Can a trial court award "the lesser of" two sums in a division of assets to be implemented by a Qualified Domestic Relations Order?

## BACKGROUND

The parties were married in October 1988 and separated about ten years later, on June 28, 1998. Constant "bickering" was the problem in the marriage that ultimately caused the parties to separate. Almost five years passed between the date of separation and April 7, 2003, the date an amended judgment of divorce was entered.

Carol Ann suffers from fibromyalgia, bone density loss, late-onset asthma, and migraine headaches. Additionally, Carol Ann was in a car accident more than twenty years ago, which caused her to undergo a cervical fusion. The sequela of that fusion have caused Carol Ann to have recurring neck problems.

Michael has no health problems that interfere with his ability to work and carry on normal activities. He has been employed since 1988 by the Chesapeake Publishing Corporation. Presently, Michael is the general manager of the Easton Printing Division of Chesapeake Publishing. His gross salary is $83,600 annually or $6,966.67 monthly. After deductions, he nets $4,911.09 per month. As a fringe benefit, Michael's employer expends $416 per month to lease a car for his use.

Carol Ann is unemployed. Prior to her marriage to Michael, she worked as a secretary. She last looked for work in 1998—the year the parties separated. During the period of separation, she has tried volunteer work, but, according to her

testimony, the activity caused her pain and made it impossible to do the assigned work. For that reason she has not sought employment since 1998.

Carol Ann worked for nine months at a floor store in Cambridge, making $100 per week in 1992 or 1993. In 1996–1997, for a period of about eighteen months, she drove a school bus, transporting Head Start students for the Talbot County School Board. She earned approximately seven dollars per hour as a bus driver ($14,500 yearly) but was terminated from that job because she had had too many accidents.

According to Carol Ann, she "would love to work" but cannot due to her many health problems. In 2000, at age sixty-two, Carol Ann elected to commence receiving Social Security retirement benefits. Persons who elect to receive benefits at sixty-two receive smaller benefits than those who elect to receive benefits at age sixty-five or later.[2] Her Social Security benefits are currently only $499 per month.

Michael testified at trial that he was not familiar with his wife's present health problems because, since the separation, he almost never sees her. He believed, however, that Carol Ann was capable of working part-time (twenty-five to thirty hours per week) at one of the senior programs run by Wal–Mart or McDonalds in the local area. Based on his knowledge of the local economy, he opined that Carol Ann could earn between $6.50 and $8 per hour at one of these positions for seniors.

The parties jointly own a house in Denton worth $282,500. They have $147,500 equity in that property. Post-separation, Carol Ann has lived in the Denton residence, but Michael has paid the first mortgage payments on the house in the amount of $1,246 monthly, plus an additional $81 per month owed on a second mortgage secured by the home.

Michael, at the time of trial, lived in a one-bedroom apartment in a private home in Easton. He pays rent of $525 per month for that room.

---

2. *See Brewer v. Brewer,* 156 Md.App. 77, 103, 846 A.2d 1 (2004).

On January 4, 2002, which was more than three years after the parties separated, Michael borrowed $15,500 from his 401(k) plan. He used $4,000 of those funds to make a court-ordered contribution to Carol Ann's attorney's fees; the remainder of the borrowed funds was used to pay his attorney in the subject case.[3] Michael later repaid $1,835 to his 401(k) plan. The unpaid portion is now approximately $13,665. After the loan is deducted from the 401(k)'s value, the plan, as of the October 18, 2002, divorce hearing, had a balance of $15,570.05.

## QUESTIONS 1 AND 2

The trial judge ruled that Michael had dissipated $13,665 of marital property when he used that sum to pay attorney's fees. Michael contends that the trial judge erred in making that ruling. He also contends that the trial judge erred when she concluded that Carol Ann's fifty percent marital share of the 401(k) plan was worth $21,050.18.

At trial, it was undisputed that the gross balance of the 401(k) plan was $29,235.05 as of June 30, 2002, and that this latter figure included the unpaid loan balance of $13,665.31. In their briefs, both parties agree that the trial judge erred when she added the gross figure of $29,235.05 to the amount of the loan and divided the sum by two, thereby concluding that Carol Ann's fifty percent share of the 401(k) plan was worth $21,450.15. Carol Ann contends that a fifty percent share of the 401(k) plan should have been valued at fifty percent of $29,235.05 or $14,617.53.

Because Michael takes issue with the court's finding that he dissipated $13,665.31 of marital funds, he contends that the court should have calculated Carol Ann's fifty percent marital

---

3. The trial judge said in her written opinion that Michael used the $15,500 to pay his own attorney's fees. That finding was partially, but not entirely, accurate. As Carol Ann admits in her brief, "Michael borrowed $15,500 from his 401(k) plan during the pendency of this action. He used the funds to pay his attorney's fees, and those attorney's fees he was ordered to pay [for Carol Ann] by Judge Heller."

share of the 401(k) plan at fifty percent of $15,569.84 ($29,-235.05—$13,665.31) or $7,784.87.

In *McCleary v. McCleary,* 150 Md.App. 448, 462–63, 822 A.2d 460 (2002), we said:

"Dissipation may be found where one spouse uses marital property for his or her own benefit for a purpose unrelated to the marriage at a time where the marriage is undergoing an irreconcilable breakdown." *Sharp v. Sharp,* 58 Md.App. 386, 401, 473 A.2d 499 (1984). *We have defined dissipation as expending marital assets "for the principal purpose of reducing the funds available for equitable distribution." Jeffcoat v. Jeffcoat,* 102 Md.App. 301, 311, 649 A.2d 1137 (1994).

(Emphasis added.)

The parties have directed us to no Maryland appellate decision, and we have found none, that addresses the issue of whether the use of marital property to pay attorney's fees constitutes dissipation. And, among our sister states, there is a split of authority regarding that issue. *See, e.g., In re Marriage of DeLarco,* 313 Ill.App.3d 107, 245 Ill.Dec. 921, 728 N.E.2d 1278, 1284 (2000) ("Expenditures for attorney's fees out of marital assets are a dissipation of marital assets."); *In re Marriage of Walls,* 278 Mont. 413, 925 P.2d 483, 486 (1996) (It was not an abuse of discretion for the trial court to include monies wife used to pay attorney in calculating her share of the marital estate.). *But see Thomas v. Thomas,* 40 Va.App. 639, 580 S.E.2d 503, 506 (2003) (Post-separation expenditure of marital funds for items such as attorney's fees constitutes a valid marital purpose and does not constitute dissipation); *Anderson v. Anderson,* 514 S.E.2d 369, 380 (Va.App., 1999) (same); *Decker v. Decker,* 17 Va.App. 12, 435 S.E.2d 407, 412 (1993) ("expenditure of funds for items such as living expenses, support, and attorney's fees, constitutes a valid marital purpose and is not dissipation or a deliberate attempt to affect a monetary award"); *Akers v. Akers,* 582 So.2d 1212, 1216–17 (Fla.Dist.Ct.App.1991) (It was incorrect to include amount wife used to pay attorney's fees in her share of the marital

assets.); *Hortis v. Hortis,* 367 N.W.2d 633, 636–37 (Minn.Ct. App.1985) (In making a marital property award, it was appropriate for the court to disregard withdrawals by a spouse from a variable annuity savings account, which was marital property, to pay legal fees and expenses.); *Harbour v. Harbour,* 227 A.D.2d 882, 883–84, 643 N.Y.S.2d 969 (N.Y.App.Div.1996) (Husband did not dissipate marital funds when he used those funds to pay, *inter alia,* legitimate counsel fees).

In the article, *Expenditures for Attorney's Fees as Dissipation: Spending Marital Funds for Attorney's Fees* ("the Dissipation Article"), the author opines:

> As a policy matter, attorney's fees should generally be viewed as a legitimate expenditure of marital funds. Since the law permits divorce, the law should permit spouses to spend the funds necessary to pay for legal services in divorce proceedings. Divorcing spouses usually do not have their own separate funds to pay their lawyers, so a rule that condemns the use of marital funds for legal services simply does not make sense.
>
> The doctrine of dissipation was developed as a tool to prevent and remedy economic misconduct that could frustrate an equitable distribution of partnership assets. Expenditures for legal services cannot be fairly characterized as economic misconduct. On the contrary, it should be viewed as entirely appropriate for people facing marriage breakdown to obtain the legal advice and assistance needed to equitably distribute marital assets.
>
> Furthermore, it wastes resources to require spouses either to seek court permission before spending marital funds to obtain legal assistance or to seek a preliminary award of fees rather than spending the money necessary to obtain counsel. The doctrine of dissipation should remain available, however, to provide an avenue for redress if one spouse spends an unnecessary or unreasonable amount of marital funds on legal fees.

15 No. 8 EQUITABLE DISTRIBUTION J. 85 (August 1998).

We agree with the view just quoted from the Dissipation

Article.[4]

The attorney's fees Michael paid appear to be entirely reasonable, and there was no indication that his expenditures were made with the goal of reducing the amount of monies available for a monetary award. Michael, after the separation, lived modestly, but after paying Carol Ann $1,400 per month in *pendente lite* alimony and making mortgage payments of over $1,300 monthly on the house where Carol Ann lived, he had little left over from his net monthly income of $4,911.09 to pay for his own everyday expenses. Unless he sold his personal belongings or was willing to pay a large tax bill for early liquidation of a non-marital IRA worth $18,779.48, Michael had no choice but to pay his attorney's fees (and those of Carol Ann's that the court ordered) out of marital property. The same is true with many other couples who divorce.

The obvious purposes for expending the funds were two: (1) to avoid representing himself in a case where his spouse sought, among other things, an award of indefinite alimony and (2) to obey a lawful order to pay a portion of his wife's attorney's fees.

Michael's $13,665.31 expenditure did not meet the definition of "dissipation" set forth in *Jeffcoat v. Jeffcoat,* 102 Md.App. 301, 311, 649 A.2d 1137 (1994), and reaffirmed recently in *McCleary, supra,* 150 Md.App. at 462–63, 822 A.2d 460, *viz:* expenditures of marital funds "for the principal purpose of reducing the funds available for equitable distribution." *See also Ledvinka v. Ledvinka,* 154 Md.App. 420, 428, 840 A.2d 173 (2003).

We hold that when, as here, a spouse uses marital property to pay his or her own reasonable attorney's fees, such expenditures do not constitute dissipation of marital

4. One practical problem of adopting a contrary rule in Maryland is that, under Maryland law, the wages a spouse earns while separated are marital property. If a separated spouse uses income during the marriage to pay his or her attorney's fees, such expenditures would be from marital funds.

assets. Thus, the trial judge erred when she ruled that Michael had dissipated $13,665.31 of marital funds.

Because the court made a mathematical error in calculating Carol Ann's share of the 401(k) plan, and because the court erred when it ruled that Michael had dissipated marital funds, Carol Ann's fifty percent share of the pension plan equaled $7,785, not $21,050, as the court calculated.

### QUESTION III

Michael frames his third argument as follows:

Because neither the trial court's ruling nor the record indicates how the trial court exercised its discretion in determining the amount of alimony, the award should be reversed.

It is important to note that Michael *does not* contend that the evidence presented to the trial judge did not support an award of indefinite alimony. We mention what appellant failed to argue because, in her response to the third argument, Carol Ann's brief completely disregards the argument made by Michael and instead analyzes whether the evidence supported an indefinite alimony award. This approach is unhelpful.

The trial judge, in making an indefinite alimony award of $2,300 per month, analyzed, in commendable detail, the first eleven factors set forth in section 11–106(b) of the Family Law Article ("FL") of the Maryland Code (1999 Repl. Vol.). Among the numerous findings of fact made by the court concerning section 11–106(b), eight are here of particular relevance, *viz:* (1) Carol Ann's sole income is from a Social Security check in the amount of $499 monthly; (2) "[d]ue to her age (64) and health problems" Carol Ann "[d]oes not have the present ability to become wholly or partly self-supporting"; (3) it would take "two to four years" for Carol Ann to "gain sufficient education or training and find suitable employment" because she "would have to take secretarial courses or go back to school and get a different degree"; (4) Michael has the ability to earn the net sum of $4,911.09 per month; (5)

Michael presently has monthly expenses of $5,206.07, but after a divorce is granted and the marital home in Denton is sold, his expenses, excluding alimony, will be $2,560.07; (6) once the house in Denton is sold and Carol Ann moves into an apartment costing $650 per month to rent, her monthly expenses will be $2,750, which, according to the court will cause her "to have a monthly deficit" of $2,300; (7) the parties' equity in the house in Denton is $147,500 ($282,500 less $135,000 in mortgages), which will, upon sale, be divided equally;[5] and (8) Michael has outstanding debts, excluding the mortgages on the marital home, of $52,100 and Carol Ann's current debts equal $14,135.92.

The trial judge made an award of indefinite alimony under FL section 11–106(c), which reads, in pertinent part, as follows:

(c) *Award for indefinite period.*—The court may award alimony for an indefinite period, if the court finds that:

* * *

(2) even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate.

■ To make an award of indefinite alimony under section 11–106(c)(2), the court must make a "projection [of the dependent spouse's future income] to the point where maximum progress can reasonably be expected." *Roginsky v. Blake–Roginsky*, 129 Md.App. 132, 146, 740 A.2d 125 (1999). Appellant contends that it is unclear from the trial judge's opinion whether the court thought that in the future Carol Ann could be gainfully employed.

The following portion of the trial court's opinion in regard to FL section 11–106(c)(2) is here relevant:

**5.** Michael, however, will net only $56,250 inasmuch as he must pay Carol Ann a $17,500 monetary award due to the fact that Carol Ann advanced $35,000 of non-marital funds to buy the marital home.

In making [the projection required by FL section 11–106(c)(2)], this [c]ourt cannot see the gap between the parties' disparate standards of living ever being small enough to be conscionable. To become employed, the [d]efendant would have to reenter the job market. At 64–years of age, this is an extremely difficult task even for a healthy woman. *See Benkin[ v. Benkin]*, 71 Md.App. 191, 203, 524 A.2d 789, 795 [(1987)]. However, the [p]laintiff's job choices are even more limited than most people because she has debilitating fybromyalgia accompanied by migraines.

The [d]efendant [Michael] argues that the [p]laintiff has had secretarial training, thus she could enter that field. This [c]ourt finds the [p]laintiff would have to receive extra training as a prerequisite to becoming employed again as a secretary because she has not received secretarial training in the past 25–years.

Even assuming the [p]laintiff went back to school, received more training as a secretary or a degree in a field that paid higher than secretarial work, and acquired a skill that she could perform under the constraints of her disability, this [c]ourt still cannot envision the [p]laintiff earning more than Twenty–Five Thousand Dollars ($25,000.00) per year, which is still only 30% of the [d]efendant's income. Thus, the gap between her and her husband's standards of living would remain unconscionably disparate. *See Broseus v. Broseus,* 82 Md.App. 183, 197, 570 A.2d 874, 881 (1990) (finding no abuse of discretion in chancellor's ruling that 34.9% income gap between the parties was unconscionably disparate). In light of these circumstances, the court will award indefinite alimony to the [p]laintiff in the amount of Two Thousand Three Hundred Dollars ($2,300.00), effective February 1, 2003.

■ We agree with appellant that the court failed to make a projection as to what Carol Ann could earn with retraining, because the judge prefaced the "projection" portion of her opinion with the words "[e]ven assuming." As appellant points out, in analyzing whether indefinite alimony should be granted under FL section 11–106(c)(2), it is of paramount

importance to know what future income (of the dependent spouse) is being projected. For instance, if the court were predicting that Carol Ann would earn $25,000 per annum in the future, her total annual income would be $30,988 ($499 X 12 = $5,988 + $25,000). That income would amount to approximately thirty-seven percent of appellant's $83,600 annual salary—not the thirty percent the court calculated. An income of $30,988, coupled with the alimony award, would mean that Carol Ann would have an income of $58,500 per year. On the other hand, Michael, after paying $27,600 yearly in alimony, would have a before tax income of only $55,400. This plainly would not be equitable, especially in a case where the parties, while married, only lived together for less than ten years.

It is important to know what, if any, future income was projected by the court for another reason. Although the court did not say so explicitly, it apparently set alimony at $2,300 per month based on the court's conclusion that Carol Ann's reasonable expenses exceeded her $499 per month Social Security income by $2,300.[6] But, if at some future date appellee earns $25,000 per year, that income, plus Social Security, would mean that her gross income ($30,988) would be less than her yearly expenses ($2,750 X 12 = $33,000) by only $2,012 or $167.60 per month. Such a shortfall clearly would not justify an indefinite alimony award of $2,300 per month against a former spouse who, according to the trial judge's calculations, would have only $51.02 per month left

---

6. The court said, in pertinent part:

[T]he [c]ourt finds the [p]laintiff's rent would be approximately Six Hundred and Fifty Dollars ($650.00) per month [after the marital home is sold]. The [c]ourt also finds the [p]laintiff's monthly expenses will be Two Thousand Seven Hundred and Fifty Dollars ($2,750.00) per month once the house is sold and she begins renting an apartment. Thus, the [p]laintiff will have a monthly deficit of Two Thousand Three Hundred Dollars ($2,300.00).

In calculating the shortfall, the court made a mathematical error. If appellee's expenses are $2,750 per month and she received $499 per month in Social Security payments, the shortfall would be $2,251 per month—not $2,300.

over after paying his living expenses and making the $2,300 alimony payment.

Because the trial judge failed to project what, if any, future income Carol Ann would earn, we shall remand this case to the circuit court so that the court can clarify this matter.

Although appellant does not contend that the evidence was insufficient to support a $2,300 per month indefinite alimony award, he does contend that the evidence would not support the conclusion that Carol Ann was unable to work and thereby "contribute to her own support to some extent." Because this issue may arise on remand, we shall discuss it.

In her written opinion, the trial judge made it clear that she believed that, at present, Carol Ann is unable to work due to her various physical problems. What was ambiguous was whether she believed that with retraining Carol Ann could work.[7]

It is true, as appellant points out, that Carol Ann did not introduce any medical records or reports to corroborate her testimony that she currently suffers from fibromyalgia, bone

---

7. The trial judge's opinion looks in two directions simultaneously regarding the issue of whether Carol Ann could work in the future. In considering alimony, the court said in regard to FL section 11–106(b)(2) (dealing with "time necessary for the person seeking alimony to gain sufficient education or training to enable that person to find suitable employment") the following:

Her only other form of employment has been working at a flooring company for ten months, making One Hundred Dollars ($100.00) per week. The [c]ourt finds that neither of these part-time jobs is suitable employment for the [p]laintiff due to her debilitating disabilities. Thus, to gain sufficient education or training and find suitable employment, the [p]laintiff would have to take secretarial courses or go back to school and get a different degree. *The [c]ourt finds it would take the [p]laintiff two to four years to receive such training or education.*

(Emphasis added.)

The aforementioned finding suggests that the court believed that Carol Ann could work in the future.

At another part of the opinion, the court said that Carol Ann "does not have the present *ability to become* fully or partly self-supporting." (Emphasis added.) This use of the words "ability to become" suggests that the court did not think Carol Ann could work in the future.

density loss, late onset asthma, and chronic and disabling migraine headaches. But at trial, there was no indication that Michael took issue with Carol Ann's testimony concerning her physical problems. Michael admitted that Carol Ann had complained of migraine headaches since 1994 or 1995 and that those headaches seemed "very, very painful." He further testified that he pleaded with Carol Ann to go to a pain clinic at "a larger hospital" such as Johns Hopkins to get help for her migraine problem. Moreover, he admitted that he had said in deposition that he did not believe it was safe for Carol Ann to be driving a motor vehicle.

Carol Ann's uncontradicted testimony in regard to her physical problems, coupled with her testimony that her attempts to do volunteer work were unsuccessful due to physical problems was, if believed in its entirety, sufficient to prove that, at age sixty-four, she was incapable of holding a full or part-time job in the future. On the other hand, the aforementioned testimony by no means compelled that conclusion.

Appellant also complains that the trial judge did not explain how she reached the conclusion that, after the house is sold, Carol Ann's monthly expenses would be $2,750 per month inasmuch as, according to Carol Ann's financial statement, her expenses would be $3,300 per month. There is no merit in this complaint. It is an unfortunate fact that expenses are sometimes exaggerated when financial statements are prepared for use in domestic relations cases. Quite obviously, a trial judge is not obliged to believe every word in a financial statement supplied by a litigant. Moreover, the trial court is not required to set forth its exact thought process in arriving at conclusions of this sort. *See Campolattaro v. Campolattaro*, 66 Md.App. 68,79, 502 A.2d 1068 (1986).

Appellant next argues:

> With respect to the remainder of the [FL section 11–106(b)] factors, the [t]rial [c]ourt found[ ] that the parties enjoyed a comfortable standard of living during their marriage, had been married just over 14 years, had both contributed to the well-being of the family[,] with Mr.

Allison the principal financial supporter and Mrs. Allison the primary caretaker of the family home, had become estranged because of their bickering, had agreed to the value of the house and a distribution of personal property, and that Mr. Allison was 44 and Mrs. Allison was 64. The [t]rial [c]ourt, however, did not explain these findings or comment on them, leaving their application to the alimony award unclear.

(Reference to appendix omitted.)

There was no need for further explanation or comment in regard to the FL section 11–106(b) factors just mentioned. It is clear from a review of her opinion that the trial judge considered all these factors. Therefore, what was said in *Doser v. Doser,* 106 Md.App. 329, 356, 664 A.2d 453 (1995), is apposite:

> In considering these factors, the trial court need not use formulaic language or *articulate every reason for its decision with respect to each factor.* Rather, the court must clearly indicate that it has considered all the factors. Where the trial court's review of the factors is not clear, this Court may look to the record as a whole to determine whether the trial court's findings were based on a review of the factors. (Citations omitted.)

Lastly, appellant complains that, although he testified that he had borrowed $10,000 from his grandmother, the trial court "did not address" that loan in her decision. While it is true that the loan was not explicitly mentioned, the court evidently did not believe that the loan was legitimate.

Michael testified that when he started up a computer business he borrowed $10,000 from his grandmother. On cross-examination the following colloquy took place:

Q [COUNSEL FOR APPELLEE:] Were you obligated to pay [the $10,000 loan] back?

A Yes, I believe I am.

Q Are there specific terms?

A No, there [are] not.

Q   ... And have you made any payments on it?

A   No, I have not.

Based on testimony such as that just quoted, the trial judge was not obligated to spell out her reasons for disregarding the alleged $10,000 loan.

### QUESTION IV

Carol Ann, in her cross-appeal, acknowledges that ordinarily a reversal and remand on the issue of a monetary award means that the alimony award must also be reversed because the two are so closely interrelated. *See Skrabak v. Skrabak,* 108 Md.App. 633, 658, 673 A.2d 732 (1996). Carol Ann stresses, however, that the general rule is not absolute. She urges us not to apply the general rule in this case.

Whether or not the general rule is an inflexible one need not be decided. Here, it is necessary to reverse and remand the award of indefinite alimony for the reasons we discussed in our analysis of Question 3.[8]

### QUESTION V

Lastly, Carol Ann argues in her cross-appeal that the trial court could not appropriately award "the lesser of" two sums in its attempt to make a division of assets to be implemented by a qualified domestic relations order. We agree. On remand, the trial judge should specify the exact amount that should be transferred from Michael's 401(k) plan to the qualified domestic relations order.

**JUDGMENT REVERSED AND REMANDED AS TO ALIMONY AND MONETARY AWARD; JUDGMENT**

---

**8.** Even if the trial judge had made a prediction as to future income as required by FL section 11–106(c)(2), a remand would be necessary in this case. In awarding alimony, the trial court was obliged to consider the financial circumstances of both parties. The court miscalculated the value of Michael's 401(k) plan, believing it was worth $42,900.30 when it was actually worth $15,570. It is entirely possible that this miscalculation may have affected the court's view of Michael's present financial well being, as well as that of Carol Ann.

OTHERWISE AFFIRMED; COSTS TO BE PAID EIGHTY PERCENT BY APPELLEE/CROSS–APPELLANT AND TWENTY PERCENT BY APPELLANT/CROSS-APPELLEE.