582 So.2d 1212 (1991)
Sandra Barr AKERS, Appellant,
v.
Edward Lee AKERS, Appellee.
No. 88-2982.
District Court of Appeal of Florida, First District.
June 21, 1991.
Rehearing Denied August 14, 1991.
*1213 William H. Maness, Jacksonville, for appellant.
Tyrie A. Boyer of Boyer, Tanzler & Boyer, Jacksonville, for appellee.
SMITH, Judge.
Appellant, the former wife, appeals from a final order adjudicating the property and financial issues between the parties in a bifurcated dissolution proceeding. The issues raised on appeal relate to the manner in which the trial court evaluated and distributed real properties owned by the parties; the trial court's determination of marital assets available for distribution, and alleged errors in the allocation of these assets between the parties; the limitation of the alimony award to one year of rehabilitative alimony; and denial of the wife's claim for attorney's fees. We affirm in part, reverse in part, and remand.
The twenty-five year marriage of the parties, both forty-five years of age, was dissolved by final judgment on November 9, 1987, at which time over the wife's objection, presentation of evidence and adjudication of all property and financial matters was reserved for a later bifurcated proceeding. Evidentiary hearings on the reserved issues were held on January 13, 1988, and on August 23, 1988. A final order adjudicating all reserved issues was entered on October 17, 1988. This appeal followed.
The parties married and lived in West Virginia throughout their marriage and until the appellee/former husband's employment required him to move to Jacksonville, Florida. The appellant also moved to Jacksonville after termination of her employment in West Virginia in June 1987. The appellee has worked throughout the marriage for CSX Transportation, or its predecessor railroad company, and has worked his way up to a beginning management level. He has college credits but no degree. His present income (at the time of the hearings) is approximately $65,000 to $75,000 annually, depending upon annual performance bonuses.
The appellant has also been employed throughout the marriage, and until approximately the time of the filing of the dissolution by the appellee in June 1987. She worked for one employer the entire time, doing work in a one-man office as "office manager," earning a gross annual income of approximately $16,000 in the year preceding the filing of the dissolution. She has only a high school education. Since the parties had no children, she has devoted herself to her job, attending to household duties, and accommodating herself to life with the appellee.
During the marriage, the parties acquired jointly-owned real property valued  according to the appellee's testimony, which was accepted by the trial court  at some $180,000. This figure included the $90,000 equity in the new, roughly $240,000 jointly-owned Jacksonville home purchased on the same date appellee filed his dissolution proceeding.
*1214 Appellant's challenge to the trial court's disposition of the realty is based upon several grounds, none of which we find meritorious. She first contends that the trial court erred in accepting the appellee's testimony as to values over that of appellant, who placed higher values on the Jacksonville home, which was awarded to appellee, and lower values on other properties which were awarded to her. Thus, appellant contends there was a disparity in the division of these assets. We find that the trial court's valuations were within the range of values presented by the parties, and that appellant has failed to demonstrate that the appellee's testimony was so inherently incredible or lacking in foundation as to require the trial court to disregard it. As conceded by appellant, the applicable rule is that, ordinarily, an owner is qualified to testify to the value of his own property. Hill v. Marion County, 238 So.2d 163 (Fla. 1st DCA 1970); 24 Fla.Jur.2d 296, Evidence and Witnesses § 659. The trial court's acceptance of appellee's testimony over that of appellant was within the broad discretion vested in the court over such matters. As for appellant's contention that this court should reverse with directions that the trial court appoint an independent expert appraiser, we have been referred to no authority for such action by this court; and even if permissible, we find no necessity or justification for such an extraordinary procedure in this case. The parties had every opportunity to present expert evidence, and their failure to do so cannot be used as a vehicle to obtain a second trial.
With respect to the court's award of the Jacksonville home to the appellee, we again find that the court acted within the range of permissible discretion. The facts are that the appellee has remarried, and desires to reside in the new home. The appellant, on the other hand, although she was awarded temporary possession of the home after the dissolution, and pending resolution of the property and financial matters, by her own admission, intended to return to and make her home in West Virginia. Her argument, as we understand it, seems to be that the trial court, in order to do "equity," should have left undisturbed the parties' joint ownership of this property, so that it could be sold and the proceeds of the sale divided between them. While the trial court might have done as appellant suggests, there were good reasons not to, and in any event, no abuse of discretion is shown with respect to disposition of the home.
We next consider appellant's contention that the trial court erred in its determination of the cash and monetary assets available for distribution, and in its allocation of these assets to each party in the final order. Argument on this issue addresses the court's alleged error in the adoption of appellee's schedule setting out a proposed distribution of marital assets. Appellant contends that the court overlooked or mischaracterized certain expenditures from the parties' joint bank accounts which were charged to the appellant as a part of her equitable division. Appellant also asserts that the court, in calculating the award to appellee, failed to consider certain accounts and monetary sums not disclosed in appellee's statement of marital assets, but which were otherwise proven to be in his possession or to have been received and used by him for his sole benefit. We find that appellant has demonstrated errors on these issues compelling reversal.
The focus of the parties' arguments regarding the disposition of the cash assets of the parties centers primarily upon a joint Merrill Lynch Cash Management Account maintained by the parties. In the final order of distribution, in allocating the Merrill Lynch account, the trial court assumed a starting net value of $144,005.63, of which the sum of $25,062.56 was assigned to the husband, and $118,943.07 to the wife.[1]
The parties presented to the trial court extensive testimony and documentation *1215 whereby both parties attempted to account for all sums withdrawn from the account by each party, and to establish whether the sums were used for the sole benefit of one or for their joint benefit. These withdrawals and expenditures of each party were then allocated to them respectively and assigned by the court as a part of each party's share of marital assets in the final equitable division. Although the parties disagree as to the proper starting date for this "accounting," and to some extent on the amounts involved, it is clear that both parties withdrew large sums after their marital friction began in June 1986, and continuing thereafter to the filing of the dissolution proceeding.[2] The largest withdrawal by the appellee was the sum of approximately $91,000.00 used as a down payment on the Jacksonville home purchased on the date dissolution was filed.[3]
The trial court found that the appellant withdrew sums totaling some $126,000.00 *1216 from the Merrill Lynch or other accounts. At the time of some of these withdrawals, appellant was still residing in West Virginia, although her husband had been transferred to Jacksonville. The largest sum withdrawn by appellant was $95,000.00, which she withdrew on June 22, 1987, after the filing of the petition for dissolution by appellee. Appellant testified that this action was prompted by her recollection of the occasion in 1985 when appellant withdrew $40,000.00 from their joint account during a temporary estrangement.
Appellant contends that the trial court overlooked the evidence that of the monies allegedly expended by her from the Merrill Lynch account, a portion of those expenditures represented mortgage payments on the Jacksonville home, totalling $18,993.00, and the expenditure of $1,900.00 for home, lawn and pool maintenance at the Jacksonville home, making a total of nearly $21,000.00 which was improperly allocated as an asset already received by appellant. The court's error in overlooking this item and in otherwise misinterpreting the nature of the appellant's expenditures of the funds withdrawn by her, is highlighted by the trial court's comments in the final order regarding her expenditures. The evidence at the time of the final hearing revealed that the appellant had remaining in her possession the sum of $49,234.20 of these withdrawn funds. Addressing this fact in the final judgment, the court found:
Based upon the "cash on hand or in banks" ... she [the appellant] has chosen to spend from July 1987 to August 1988, approximately $76,000 of the $126,000 cash she had in her sole possession instead of working and saving as she had diligently done along with the Husband during their marriage. The Court cannot ignore that the Husband chose to continue the same work ethic as in the past.
With all due respect to the trial court, as pointed out by appellant, this observation by the court, considered in the light of all the evidence in the record, reveals not only fundamental mathematical errors or discrepancies in computations, but a mischaracterization of the appellant's entire conduct with respect to disposition of the funds at her disposal. The trial court undoubtedly overlooked the undisputed evidence that of the $76,000.00 the appellant "squandered" (as argued by appellee), the wife paid the mortgage payments and home maintenance of nearly $21,000.00 on the Jacksonville home which was ultimately awarded to appellee. These payments had no effect on the "equity" assigned to the Jacksonville home for purposes of distribution, and consequently represented no benefit to appellant. We find that it was an abuse of discretion to consider this money as representing an asset chargeable to appellant in considering equitable distribution.
In addition to the foregoing, the court apparently also overlooked the fact that from June 1986 to the date of the final order of distribution, the appellee provided no support for appellant. Thus, except for the modest income from her job, the Merrill Lynch or other joint funds were the only sources available for her needs, and even some joint obligations and expenses which she continued to pay from those funds (see footnote 2, supra). It is noted that from June 1986 to June 1987, appellant continued to work at her $300.00 a week job, but after June 1987, when she moved to Jacksonville, she was unemployed.
Also included in the expenditures allocated to appellant as part of her equitable distribution was the sum of some $11,000.00 in attorney's fees which she paid from the $95,000.00 withdrawn from the Merrill Lynch account. The reasonableness and necessity for these expenditures is nowhere challenged in this record nor on appeal. There is no contention, nor indeed could there reasonably be, that appellant's *1217 earnings were sufficient to enable her to pay the cost of adequate legal representation. In view of our disposition below of the point on appeal regarding the court's denial of appellant's attorney's fees, we find that it was error to include this sum in appellant's distributive share of marital assets.
The disparity in the ability of the two parties to maintain themselves and carry on this litigation, and to pay the expenses of their protracted and bitter litigation, is so obvious as to hardly warrant further comment. The appellee continued throughout this time in a comfortable, $65,000 to $75,000 a year job (his gross compensation for 1987 was $78,369.03), while the wife continued in her $16,000 a year job until that too came to an end, through no fault on her part, when she moved to Jacksonville in June 1987. Evidence of the wife's need is conclusively demonstrated by the provision for rehabilitative alimony in the final order. It is clear that the same need had existed, by the overwhelming abundance of the evidence, at least to some extent when the discord between the parties first manifested itself, and certainly by the time appellee filed the petition for dissolution in June 1987. Therefore, with respect to the $76,000.00 allocated to the wife as a part of her equitable distribution, the trial court obviously overlooked the appellant's necessity to resort to these funds in order to maintain her customary standard of living to the date of the final hearing, which encompassed a period of some fourteen months after the termination of her employment in West Virginia. Failure to consider this circumstance, if not overlooked, was an abuse of discretion.
Turning next to the appellant's contention that the trial court failed to consider certain assets received or possessed during the pertinent accounting period, appellant presents in her brief an itemization of funds and accounts totalling in excess of $74,000.00, which were in the possession of or expended by appellee for his own benefit, but were never included in appellee's schedules or documentation of his own expenditures or assets. Nor were these funds considered by the trial court in determining the share of marital assets to be allocated to him. The specific amounts included in this category are: Coastline Credit Union savings and checking accounts ($27,565.09 and $569.80)[4]; First Huntington C & O Credit Union accounts ($836.40 and $1,800.00); Sun Bank account ($519.44); reimbursement received by appellee for travel expenses paid from Merrill Lynch account, not returned to the account ($11,006.97); MICP 1987 bonus ($10,125.00); MICP 1986 bonus ($4,031.00); moving allowance paid by railroad and retained by appellee ($11,212.23); refund from Universal Homes retained by appellee ($1,500.00); refund of Deerwood deposit retained by appellee ($5,000.00). In addition to these sums, appellant has shown that appellee received and retained or used for his own benefit all of his payroll checks after June 1986, rather than depositing them in the parties' joint Merrill Lynch account as had been the parties' standard practice; at the same time, according to appellant, appellee incorrectly indicated to her that he was opening joint bank accounts in Florida with these funds in order to establish credit.
With respect to these "unaccounted for" assets which appellant contends should have been charged to appellee, appellant's brief points to specific testimony and documentation in the record proving the existence of these items, some of which are supported even by specific admissions by appellee during the proceedings below. The appellee's brief, on the other hand, only cites generally to the record, pointing out no specific evidence which satisfactorily *1218 explains or refutes appellant's contentions with respect to these unaccounted for assets. Appellee's main argument on appeal with respect to these assets is that the trial court was free to accept or disregard the evidence of the parties in his discretion. While we accept this as a general proposition, we cannot accept the trial court's unexplained rejection of evidence which is properly presented in the same fashion as other evidence which was accepted by the court, and which is neither refuted nor explained by other evidence. We reject the notion, implicit in appellee's entire argument, that with respect to the accounting and documentation of their financial activities by the parties the trial court was faced with an "either-or" situation, that is, that the trial court was either required to or could arbitrarily accept "wholesale" the accounting of one party or the other. We hold that under the circumstances presented here, it was incumbent upon the trial court to consider the documentation and the testimony presented by both parties, and where conflicting interpretations or discrepancies appear, to reconcile these differences in the interest of both parties to achieve a fair and equitable result.
We have noted appellee's failure to specifically address any of these items referred to by appellant as "unaccounted for" assets. It is true, as appellee points out, that appellant did not include in income which she received a payment of $3,500.00 on a promissory note payable to the parties jointly; nor did she include unemployment compensation received by her after giving up her job in West Virginia. We find, though, that the record does not support appellee's contention that appellant had "hidden and failed to credit to herself" a withdrawal she made from one of the parties' joint accounts. In any event, these so-called discrepancies and omissions referred to by appellee are de minimis in comparison to the errors or discrepancies identified by appellant. Appellee's argument that the discrepancies in appellant's financial information was sufficient to support the trial court's finding that the appellee's proposed schedule of equitable distribution was "the more accurate and equitable" of the two simply does not address the specific matters raised by appellant. We therefore find it necessary to reverse and remand this cause for reconsideration of the equitable distribution made by the court, during which appropriate adjustments are to be made by considering each of the specific items and matters we have identified above. The trial court is to then make additional findings of fact explaining precisely and specifically the disposition of these items and the evidentiary basis for such disposition.
With respect to the award of rehabilitative alimony of $1500 monthly for one year, we also find it necessary to reverse. There is no evidence to support a finding by the court, if one had been made, that appellant has the ability through retraining or education to provide for herself a standard of living reasonably commensurate with the standard established during the marriage. The law on this issue is stated in Askegard v. Askegard, 524 So.2d 736, 737 (Fla. 1st DCA), rev. denied, 536 So.2d 243 (Fla. 1988), quoting, O'Neal v. O'Neal, 410 So.2d 1369, 1371 (Fla. 5th DCA 1982):
A person is not self-supporting because he or she has a job and income. The standard of living must be compared with the standard established during the course of the marriage. A divorced wife is entitled to live in a manner reasonably commensurate with the standard established by the husband during the course of a long-term marriage. [citation omitted]. A court must base an award of alimony to a wife upon the ability of her husband to pay that award in light of the standard of living she enjoyed during the marriage.
The only evidence with respect to the duration of any kind of rehabilitative plan to make appellant wholly self-supporting was her testimony that she would like to improve her skills and earning ability by seeking a four-year college degree, but there is no evidence of her potential employment and earning ability even if she should be able to complete that education. Receiving a four year college degree when one is in *1219 her early fifties is no guarantee of a significant increase in earnings. The evidence, considered in light of appellant's past earning history revealed by the record, does not support a finding that appellant will likely establish the earning power to become wholly self-sufficient within a single year as provided in the appealed judgment. This record contains no evidence that will support a rehabilitative plan likely to qualify appellant to earn a salary to enable her to live in a manner comparable to that enjoyed during the marriage. We find that even if it be assumed that the distribution of marital assets by the court was fair and equitable, which we find not to be the case, the evidence requires an award of permanent rather than rehabilitative alimony, as a cursory review of recent cases applying settled law demonstrates. Wolff v. Wolff, 576 So.2d 852 (Fla. 1st DCA 1991); Holmes v. Holmes, 579 So.2d 771 (Fla. 2d DCA 1991); Meachum v. Meachum, 580 So.2d 331 (Fla. 2d DCA 1991); and see, as to the award of permanent alimony even where there has been a substantial distribution of assets, Hamlet v. Hamlet, 583 So.2d 654 (Fla. June 13, 1991). The award of rehabilitative alimony is reversed. An award of permanent periodic alimony in the amount of $1500 monthly, or more, with reservation of jurisdiction to modify the award upon a material change in circumstances is mandated by the evidence.[5]
We also reverse the trial court's ruling charging to the appellant the sum of $6500.00, representing the value of a coin collection which appellee testified he found missing from the safe in their West Virginia home. The appellee testified that in March (appellant says it was May) 1985, when the parties were having arguments, he removed the coin collection from the parties' safety deposit box in their local bank, and then when they "got back together again," he put the coins in a safe in their West Virginia home. We find no indication in the record as to when he last saw the coin collection in the safe. Appellant, on the other hand, testified that she did not discover that the safety deposit box had been cleaned out until she went to the bank in January of 1987 and found it empty; she also testified that she never saw the coin collection in the safe at the home and never looked in the safe. She testified also, without contradiction, that the combination to the safe was in the safety deposit box, and that it had been removed at the time appellee removed everything else. The record, so far as the parties have demonstrated, does not disclose that either of them saw the coins after they were placed in the safe by appellee in 1985. Appellee's brief (page twenty-four) states in part: "the coin collection was stored in the couple's West Virginia home beginning in January of 1987." We find that the record citation for this statement (Vol. III, page 75) does not support this statement. The testimony of appellant reported on the cited page contains no reference to the date when the coins were supposedly stored in the safe, only that she learned that appellee had removed them from the safety deposit box when she looked in the box in 1987. Her further testimony on the cited page clearly shows that she never saw the coins in the safe. Although we acknowledge the trial court's great latitude in accepting and rejecting testimony, we conclude under the circumstances of this case that the trial court went beyond the bounds of his discretion in interpreting this evidence as support for the charging of this $6500.00 coin collection to appellant. We acknowledge that under certain circumstances, it is proper to infer that a party last in possession of property that later turns up missing may be held responsible for its loss. However, we do not agree that it was proper to apply such a presumption here. Aside from the fact that there is *1220 only the barest inference that appellant was ever knowingly in constructive possession of the coins, the testimony clearly reveals that the appellee was the party involved in the shifting and concealment of assets in 1985, in that he not only took the coin collection, unknown to the appellant, but in addition, he withdrew $40,000.00 of the joint funds of the parties on the same occasion. The appellee, rather than the appellant, is the last party shown by the record to have had actual possession of the coins in question. The circumstances here are simply too inconclusive and remote in time to warrant the assignment of the total value of this coin collection to the wife as a part of her equitable distribution.
Although we have found no error in the valuation and distribution of the realty, and do not disturb the award of the marital home to the appellee, the errors in respect to the determination and distribution of the remaining marital assets requires vacation of all provisions in the appealed decree concerning the distribution of marital property so as to enable the trial court on remand to correct those errors and effect a fair and equitable distribution of all marital assets.
Finally, we determine that the trial court abused its discretion in failing to award attorney's fees to appellant. We confess that we find the court's total denial of attorney's fees to the appellant somewhat shocking, particularly in view of the disparity in the earning capacities and actual earnings of the parties during this litigation and in view of the somewhat punitive nature of the equitable distribution suggested by the appellee and adopted by the court.
Accordingly, the final order on appeal is AFFIRMED in part; REVERSED in part, and the cause is REMANDED for further proceedings not inconsistent herewith.
BOOTH, J., concurs.
ZEHMER, J., concurs with opinion.
ZEHMER, Judge (concurring).
I fully concur in the majority opinion. I write only to point out a provision in the statutes governing the valuation of marital assets in the trial of dissolution cases that was not in effect when this trial took place, but which should be followed on remand. I point this out because the evidence on the determination of marital assets and their value covered a period of years with little agreement on any particular date as of which all marital assets were determined and valued. Section 61.075(4), Florida Statutes (1989), provides:
(4) The date for determining marital assets and liabilities and the value of such assets and the amount of such liabilities is the earliest of the date the parties enter into a valid separation agreement, such other date as may be expressly established by such agreement, or the date of the filing of a petition for dissolution of marriage, unless the trial judge determines another date is just and equitable under the circumstances.
This provision contemplates that any deviation from the specified valuation dates must be justified on specific equitable grounds set forth in the final decree. Hopefully, lawyers and trial judges will strictly observe the requirements of this provision in the trial of dissolution cases, for doing so should serve to eliminate many of the kinds of disputes and uncertainties that had to be reviewed and resolved on this appeal.
NOTES
[1] For convenience, the entire schedule of marital assets as found in paragraph one, "Equitable Distribution of Marital Assets," of the final order on appeal, dated October 17, 1988, is reproduced as follows (omitting explanatory paragraph preceding the schedule, and including post-judgment correction as to furnishings of $16,000):

Asset Net Value Husband Wife
Merrill Lynch account $144,005.63 $25,062.56 $118,943.07
First Huntington Natl. Bank account 10,728.22 - 10,728.22
Farm account  mortgage received 3,500.00 - 3,500.00
Wife's interest earned 1,630.67 - 1,630.67
Wife's IRA 13,610.35 - 13,610.35
Husband's IRA 11,392.35 11,392.35 -
CSX-tra account 16,960.00 16,960.00 -
12042 Ambrosia Court equity 90,000.00 90,000.00 -
Port Charlotte, FL lots 15,000.00 15,000.00 -
Four West Virginia lots 50,000.00 25,000.00 25,000.00
½ Kentucky farm 15,000.00 - 15,000.00
½ West Virginia lots 10,000.00 - 10,000.00
'82 Corvette automobile 12,000.00 12,000.00 -
'71 Corvette automobile 7,000.00 7,000.00 -
'78 Lincoln Continental automobile 3,500.00 - 3,500.00
'77 Jeep automobile 2,500.00 - 2,500.00
Coin collection 6,500.00 - 6,500.00
1000 shares Techniclone stock 4,000.00 4,000.00 -
Furnishings from West Virginia home 16,000.00 - 16,000.00
Furnishings in Jacksonville home 6,000.00 6,000.00 -
Paper dollars collection 113.00 - 113.00
Federal tax refund 721.00 721.00 -
 ___________ ___________ ___________
Totals $440,161.22 $213,135.91 $227,025.31
 =======================================

[2] We agree, as appellant argues, that the final figures  $25,062.56 for the husband, and $118,543.07 for the wife allocated by the court as a part of the "equitable distribution" to each party (see schedule, footnote 1, supra)  do not represent "marital assets" or the "distribution" of marital assets at all, but only represent a recap of withdrawals made from the parties joint Merrill Lynch account as shown by documentation provided by each party. As appellant argues, the majority of the withdrawals were for living expenses such as Visa charges at K-Mart and other department store purchases, and a wide variety of payments and purchases including, in addition to a down payment on the Jacksonville home and attorney's fees, such items as home furnishings, utilities, pharmacy, and repairs to the West Virginia home, etc. It is also clear that while this methodology did not focus on the production of a concrete list of marital assets available for distribution at any particular time, it appears to be the methodology voluntarily adopted by both parties, and the trial court was asked to sit, in effect, as an in-court auditor as to all the financial transactions of the parties over a period of some two years of on-again, off-again domestic strife and confusion.
[3] Although the exact status of the marriage relationship of the parties during the period between June 1986 and June 1987 is a matter of dispute, it is undisputed that appellant had knowledge of and participated fully in the purchase of the Jacksonville home. The appellant contends that the parties continued living as husband and wife up to the time of purchase of the home, while appellee claims that although they slept in the same home and went on trips together, the marital relations were at an end as of June 20, 1986. However, in his testimony, appellee testified that the purpose for buying the Jacksonville home was twofold: first, as an attempt to save his marriage; and secondly, for the tax benefits available to the parties through the reinvestment of a portion of the $160,000.00 proceeds realized from the sale of their West Virginia home earlier that year.
[4] Although neither appellee nor appellant have brought it to our attention, our own examination of the record shows that a part of the Coastline account may be represented by furniture purchased by appellee and included in his allocated share of marital assets at $6,000.00, thus amounting to "double dipping" to this extent. As for other attempts by appellee to show "double dipping" with reference to the Coastline account, we conclude that these were never satisfactorily demonstrated below, and, as is the case with respect to all other specific "unaccounted for" assets specified by appellant, the issue is simply ignored by appellee.
[5] Appellant's argument on the alimony issue (Point III, Appellant's Brief) commences with the statement: "No citation of authority is needed for the proposition that following the dissolution of marriage, particularly a 25-year marriage, each party should be able to maintain the standard set during the marriage insofar as the assets and earning capacities of those parties will permit." While we may tend to agree with the statement, we do not encourage introduction to argument on a major issue on appeal by stating "no citation of authority is needed," followed by absolutely no citation of authority.