842 So.2d 956 (2003)
Paul S. PIETRAS, Appellant,
v.
Sharon L. PIETRAS, Appellee.
No. 4D01-4841.
District Court of Appeal of Florida, Fourth District.
March 26, 2003.
Rehearing Denied May 7, 2003.
*957 Harry D. Dennis, Jr., of Law Offices of Harry D. Dennis, Jr., and Nancy Little Hoffmann of Nancy Little Hoffmann, P.A., Pompano Beach, for appellant.
Douglas H. Reynolds of Douglas H. Reynolds, P.A., Fort Lauderdale, for appellee.
POLEN, C.J.
Paul Pietras timely appeals a final judgment of dissolution from his ex-wife, Sharon Pietras. We find there are a number of mathematical errors, and some legal errors, in the final judgment, and reverse and remand for further proceedings.
Paul and Sharon were married in July of 1974. Paul was an insurance adjuster and Sharon was a teacher; neither party had substantial assets. Paul started his own insurance agency in early 1980; Sharon quit teaching the following year and worked full-time with Paul at the agency thereafter. The parties accumulated substantial assets over the life of the marriage, *958 including a large number of insurance policies. On December 31, 1998, Sharon informed Paul that she had taken a number of credit card cash advances and that she was filing for divorce. Sharon stayed in the marital home and Paul moved out. Paul continued to pay Sharon's direct household expenses, but did not provide any additional support.
A few months later, Sharon filed a motion for temporary relief which came before Judge Vonhof in August of 1999. Paul was ordered to continue paying Sharon's household expenses, plus an additional $2,500 a month. Paul was also ordered to pay Sharon a lump sum of $46,000, covering her attorney's fees and costs, and expert witness fees and costs. Thereafter, Paul filed a motion for rehearing and a motion to pay Sharon's fees and costs ($46,000 award) from certain joint marital accounts. These motions were denied in strongly worded orders, and Paul was ordered to directly pay the fees and costs award.
Paul's counsel withdrew in July of 2001 and he retained substitute counsel. Although the parties were unable to resolve all their disputes in mediation, a large number of issues were stipulated to before trial, and only a few issues were presented for judicial resolution. The parties agreed the Wife had played a large role in the financial success of the insurance agency, and consequently the marriage, and that their marital assets should be equally divided. They agreed Paul, by way of his control of the insurance agency, had a significantly greater earning potential than Sharon; they were in near agreement in calculating Paul's salary, yet disagreed over the valuation of a number of assets and the amount of alimony Sharon would be entitled to. Paul also challenged Sharon's request to stay in the marital home and maintained there would be no need to secure any court-ordered support award by life insurance. Both parties, predictably, sought entitlement to their respective attorney's fees and costs pursuant to chapter 61.
The matter proceeded to a bench trial before a successor judge in November of 2001. The trial was relatively noncontentious, and the majority of the testimony presented was that of each party's respective expert CPA. During the course of the trial, before Paul testified, Sharon's counselor submitted a proposed final judgment. Then, at the end of Sharon's case, her lead attorney testified that he and his co-counsel were entitled to the payment of all of their costs and fees by Paul, because he had "added to the effort of the lawyers in this case ... caused a lot of problems ... and filed many motions that were frivolous."
A final judgment of dissolution of marriage was ultimately entered which adopted all of Sharon's valuation figures as reflected in her proposed final judgment. The court denied Paul's petition for partition and allowed Sharon to retain control and possession of the marital home. Sharon was also awarded $14,000 a month as permanent periodic alimony. Finally, the court ordered Paul to pay all of Sharon's attorney's fees and costs, noting his "litigious behavior."
On appeal, Sharon concedes the final judgment of dissolution contains a number of duplicative entries, which should be corrected.[1]See Noone v. Noone, 727 So.2d *959 972, 974 (Fla. 5th DCA 1998)(notwithstanding trial court's wide discretion in dissolution matters, appellate court must correct mathematical errors made by the trial court). Paul also contends a number of assets were treated incorrectly, in effect failing to effectuate an even division of the marital assets as the parties had intended. Each asset will be addressed individually.

State Farm Growth Fund Investment # 60005337
An $82,855 withdrawal from this account was charged as an asset to Paul. The record reflects this charge actually consists of two sub-charges: $46,000 withdrawn by Paul to pay Sharon's costs and fees per the 1999 order on Sharon's motion for temporary relief ("Temporary Order"), and $36,855 withdrawn by Paul to pay off a number of bills that were incurred prior to the filing of the dissolution petition. Paul concedes the $46,000 was properly charged to him since he was ordered to pay such per the Temporary Order. However, he contends the $36,855 should not have been charged to him, where the money was used in January of 1999 to pay off credit card cash advances taken by Sharon before she filed her dissolution petition. We agree. Sharon's cash advances before the filing of her petition constitute a marital liability; Paul paid off this liability by withdrawing funds from a marital asset. See Rosenfeld v. Rosenfeld, 597 So.2d 835 (Fla. 3d DCA 1992). This amounts to a "wash," and where the parties agreed to use the most recent valuation dates for the marital assets, should not have been included in the equitable distribution. On remand the trial court shall deduct $36,855 from the marital net worth (assets) and deduct this same sum from Paul's award of assets under the equitable distribution.

Merrill Lynch Account # 29S 99220
(A) A $32,876 withdrawal charged as an asset to Sharon. The record reflects this sum was withdrawn by Sharon and used as a means of support during the pendency of the dissolution action. Though contrary to his financial interests, Paul acknowledges this money, used by Sharon as temporary support, should not have been included in the equitable distribution. See Akers v. Akers, 582 So.2d 1212 (Fla. 1st DCA 1991). We agree. On remand the trial court shall deduct $32,876 from the marital net worth (assets) and deduct this same sum from Sharon's award of assets under the equitable distribution.
(B) A $48,497 withdrawal charged as an asset to Paul. The record reflects this sum was withdrawn by Sharon to pay her attorneys and expert witness. Sharon concedes this charge is duplicative since Paul was already charged with payment of these fees and costs, i.e., the $46,000 withdrawn from State Farm Growth Fund # 60005337. On remand the trial court shall deduct $48,497 from the marital net worth (assets) and deduct this same sum from Paul's award of assets under the equitable distribution.

Credit card charges
A $7,135 marital liability, factored into Sharon's net worth under the equitable distribution. The record reflects this sum represents charges Sharon incurred on credit cards she had opened, in her own name, after the filing of her petition for dissolution. We find these accounts, and the amounts charged on such, are non-marital, and should not have been included in the equitable distribution. See *960 § 61.075(6), Fla. Stat. (2001)(cut-off date for determining marital assets and liabilities is earliest of the date the parties entered into a valid separation agreement, such other date as may be expressly established by such agreement, or the date of the filing of the petition for dissolution). We reject Sharon's contention that the trial court "implicitly" ordered Paul to pay these charges at the 1999 hearing on her motion for temporary relief. On remand the trial court shall remove this $7,135 liability from the parties' marital net worth, and remove this liability from Sharon's award under the equitable distribution.

State Farm Life Insurance Accounts # XXXX-XXXX & XXXX-XXXX
Account # XXXX-XXXX was charged as a $71,581 asset to Paul; account # XXXX-XXXX was charged as an $8,127 asset to Paul. On appeal, Sharon concedes these accounts were double counted since they were included as part of the Paul S. Pietras Profit Sharing Plan. On remand the trial court shall remove these accounts from the parties' marital net worth (assets) and deduct these sums from Paul's award of assets under the equitable distribution.

State Farm Life Insurance Policy # XXXX-XXXX
A $34,800 marital asset, charged to Paul. This sum represents an imputation of payments, $1,200 per month × 29 months, that Paul "failed" to make on his universal life insurance policy (on which Sharon was the beneficiary) from May 1999 until the date of the final hearing. This asset was treated too simplistically and remand is needed.
In the Temporary Order, Paul was ordered to continue to pay all of Sharon's household expenses, including "all insuraance [sic] bills." As of May 1999, Paul stopped paying the premium on a universal life insurance policy on which Sharon was the beneficiary. At trial, Sharon argued Paul's failure to continue to make premium payments on that policy depleted the policy's cash value, a marital asset. While this argument is technically correct, usage of the $1,200 figure for imputation purposes was not.
Universal life insurance is a "hybrid" form of life insurance-part insurance and part investment. Generally speaking, a universal life insurance policy allows the insurer to choose his or her own "premium." A portion of that premium is used to pay account expenses and maintain insurance coverage; the remainder is placed in an interest bearing account, known as the policy's "cash value." Even if an insured stops making premium payments on a universal life policy, as Paul did here, the insurance coverage will remain in effect as long as the policy has enough cash value to cover the account expenses, i.e., the account expenses will be debited from the policy's cash value. See Farhard Aghdami, Income, Gift, and Estate Tax Planning with Life Insurance, in ALI-ABA CONTINUING LEGAL EDUCATION (Oct. 24-26, 2001). This is precisely what occurred here.
We note Paul was obliged to continue to make some payment on this insurance policy, since his failure to do so depleted a marital asset-the policy's cash value that had accumulated by the date the petition was filed. However, on the record developed below, it is unclear to what extent Paul's failure to continue to make premium payments on this account depleted the policy's cash value. The Wife's CPA simply stated that Paul should have continued to make $1,200 premium payments on this policy, since he had previously been doing so. However, she was unable to say what portion of that $1,200 premium payment *961 would have paid for account expenses, and what portion would have added to the policy's cash value. Paul notes any excess funds deposited into the cash value of the policy, which was in his name, would have been a non-marital asset. Paul should only have been charged imputed missed premium payments on his universal life insurance policy to the extent he depleted the policy's cash value from the time period from May 1999 to the November 2001.[2] On remand the trial court shall deduct $34,800 from the parties' marital net worth (assets), and deduct that same sum from Paul's award of assets under the equitable distribution. If the parties are unable to stipulate to the amount of such, the trial court may need to receive additional evidence to determine the extent to which Paul depleted the cash value of this policy; this depleted amount should be imputed back to the parties' marital net worth (assets) and to Paul's award of assets under the equitable distribution.

Insurance reimbursements
On her cross-appeal, Sharon contends the trial court included $7,634 in the parties' marital net worth (assets), representing insurance reimbursements on Sharon's medical expenses that Paul received but never forwarded to her, but failed to include that sum when determining Sharon's award under the equitable distribution. We note the final judgment does seem to contain an inconsistency in this regard; however, given the dearth of findings by the trial court, it is simply unclear what the trial court's true intent was with regards to this sum. As such, Sharon's request for this court to deduct this entire sum from Paul's cash award, which served as the equalizer in the equitable distribution, is denied. Sharon is not foreclosed from raising this issue before the trial court on remand; the trial court may rely on the record or receive additional evidence relating to this issue within its discretion.

Alimony
Paul also contends the trial court erred in awarding Sharon $14,000 a month in permanent periodic alimony. We agree.
First, Paul contends the trial court erred in awarding Sharon the marital home, and should have ordered its sale, and a split of the proceeds, instead. We disagree, and find the trial court was well within its discretion in awarding Sharon the marital home as a cross-award as part of the equitable distribution. See Tronconi v. Tronconi, 466 So.2d 203 (Fla.1985). However, Paul's contention that he should not have to pay all of Sharon's attendant expenses with staying in the marital home has some merit. As of the date of the final hearing, Paul was living in an apartment, while Sharon remained in the marital home, which the parties acknowledged was worth $450,000. Sharon should bear some degree of financial responsibility for her decision to remain in the sizeable marital home, where there are no children of the marriage, and her reasons for staying in that home are, admittedly, sentimental. On remand, the trial court shall determine, within its discretion, what portion of Sharon's household expenses Paul shall be accountable for.
Second, Paul contends Sharon's needs were improperly inflated, where the trial court included a universal life insurance policy premium she had been paying as one of her monthly expenses. We *962 agree. As discussed, supra, universal life insurance is a hybrid form of insurance, with both an insurance and a savings component. As our supreme court held in Mallard v. Mallard, 771 So.2d 1138 (Fla. 2000), alimony may not contain a savings component. Applied to this case, Paul cannot be ordered to pay insurance premiums on Sharon's behalf to the extent those payments would increase the cash value of the policy. On remand, the trial court shall deduct this $2,201 monthly expense in recalculating Sharon's alimony award.
We find no error in the trial court's determination that Sharon was entitled to life insurance as a means of securing her support award. In this vein, the trial court may require Paul to continue to make payments on Sharon's universal life insurance policy to the extent those payments only keep the policy's insurance coverage in effect (and don't add to its cash value). See Sobelman v. Sobelman, 541 So.2d 1153 (Fla.1989). However, the trial court must make findings concerning the cost of these premiums, or premiums on any other policy ordered to secure Sharon's award, and then take this cost into account when determining Paul's ability to pay, and the ultimate amount of the alimony award. See id. at 1154 n. 2. That provision of the final judgment, which holds Paul is to maintain $1,000,000 of life insurance as security of Sharon's award, yet fails to contain any findings regarding the cost of such insurance (and its effect on the alimony award itself), is reversed. On remand the trial court may receive additional evidence relating to this issue, and, within its discretion, order a reasonable amount of security for Sharon's support award, to be in force for a reasonable amount of time.

Attorney's Fees
Finally, Paul contends the trial court erred in charging him with all of Sharon's attorney's fees and costs. We agree.
In the final judgment, the trial court found, "[Sharon] is entitled to an award of attorney's fees and costs in this matter, especially considering [Paul's] litigious behavior during the pendency of this litigation as contained in the testimony at trial." Although trial courts are empowered with broad discretion to charge attorney's fees under chapter 61, we find there was no testimony of "litigious behavior" at trial to an extent warranting payment of 100% of Sharon's fees and costs by Paul. Opposing counsel's testimony regarding this "litigious behavior" was rather nebulous; no specific instances of "litigious behavior" by Paul or his trial counsel were recounted. From our review of the record, it appears Paul originally engaged in some hard-line tactics, which caused Sharon to file her motion for temporary support. Yet, in its Temporary Order, the predecessor judge awarded Sharon $35,000 in attorney's fees alone, $15,500 of which represented prospective fees which she had not yet incurred. Subsequent to entry of this order, Paul filed two pleadings which the trial court viewed as superfluous and without merit. However, aside from the filing of these pleadings, there is no record evidence of any "litigious behavior" on Paul's behalf warranting a charge of all of Sharon's fees and costs, especially where he had already been ordered to pay $15,500 of her fees to be incurred after entry of the Temporary Order. Opposing counsel admitted that Paul's previous "misbehavior" had been greatly alleviated since his hiring of replacement counsel. Furthermore, as noted above, the parties were able to stipulate to most matters in dispute, and only a few issues were even presented for judicial resolution. As evidenced in the foregoing opinion, a large number of the positions advanced by Paul below were meritorious (e.g., treatment of universal life insurance policies), and this *963 court can not discern any "additional work" caused by Paul from the face of the record. See Mettler v. Mettler, 569 So.2d 496, 498 (Fla. 4th DCA 1990)(holding where fees are imposed for abuse of the system, they are not awarded as a punitive measure, but rather are based on the additional work made necessary by the abusive party). We further note there was no evidence of the parties' relative need and ability to pay after the equitable distribution was effectuated. See Rosen v. Rosen, 696 So.2d 697, 700 (Fla.1997). Moreover, the large number of corrections that must be made in the equitable distribution alone would necessitate reconsideration of the parties' relative need and ability. See Brock v. Brock, 690 So.2d 737, 740 (Fla. 5th DCA 1997). The attorney's fee award as it stands is reversed. On remand the trial court may apportion a reasonable amount of Sharon's attorney's fees based on a finding that Paul's "litigious behavior" caused some additional work, for which Sharon's attorneys have not already been compensated (via the Temporary Order). In addition, the trial court may award Sharon her fees under § 61.16, as it deems just, after reconsideration of the parties' adjusted relative need and ability to pay.
Sharon has moved for her appellate fees under section 61.16. Sharon's motion for appellate fees is conditionally granted, as provided in White v. White, 695 So.2d 381, 382-83 (Fla. 4th DCA 1997)(remand for trial court to determine relative need and ability to pay appellate fees).
AFFIRMED in part, REVERSED in part and REMANDED for proceedings consistent with the foregoing opinion.
GUNTHER and HAZOURI, JJ., concur.
NOTES
[1] As alluded to above, the trial court's final judgment adopted in whole Sharon's proposed final judgment, including its errors. This court is somewhat troubled by the fact the trial court failed to make a single change or correction to Sharon's proposed final judgment, especially where that proposed judgment was submitted before trial was even concluded. See Thomas v. Thomas, 781 So.2d 540 (Fla. 5th DCA 2001)(findings in final judgment must be examined to see if they are supported by competent substantial evidence).
[2] We note the $1,200 premium figure was relatively arbitrary itself. The record reflected at one time during the marriage the parties were paying as much as $3,900 a month as a premium on this policy. Moreover, Paul notes he could have argued he was entitled to a special equity for $1,200 premium payments made from the filing of the petition to May of 1999. However, Paul has expressly waived such claim.